**PBT**

FILED
MAY 17 2012
MICHAEL E. KUNZ, Clerk
By____ Dep. Clerk

#350

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

EMILY RIVERA

   -vs-

PENNCARE MEDICAL ASSOCIATES, a/k/a
PENN MEDICINE, d/b/a UNIVERSITY OF
PENNSYLVANIA HEALTH SYSTEMS;
ELIZABETH "BETTY" ANN KNOWLES
AUTUMN LUCAS and CAROLYN ECHALK

: Civil Action
:
:
:
: No.
:
:
: Jury Trial Demand
:
:
:

**12    2679**

## COMPLAINT

### I. INTRODUCTION

1.     This is an action seeking relief under, inter alia, the <u>Civil Rights Act of 1964</u>, its amendments thereto, including the 1991 amendment, and under 42 U.S.C. §2000e, 42 U.S.C. §1981, et seq.(including 1985 and 1986) and 43 Pa. C.S. 951 et seq. (The Pennsylvania Human Relations Act).

2.     Plaintiff avers that because of her race, sex, and pregnancy she was subjected to employment discrimination to include a hostile work environment and adverse employment action that included but is not limited to being suspended and terminated from her employment with PennCare Medical Association.

3.     Plaintiff asserts that the adverse action, including the employment loss, was intentional discrimination that was done by each Defendant who at such time acted together for a common purpose or plan to facilitate as aiders and abettor the employer's policy practice or custom to discriminate in employment, and that at such time too each acted individually for their own purpose to discriminate.

1



4.     Plaintiff avers the discrimination caused economic damages to be suffered by her, and that Plaintiff also sustained personal injury from the intentional discrimination.

5.     Plaintiff seeks all the relief the law and equity may provide to a person that is subjected to intentional discrimination and malicious conduct. Plaintiff specifically seeks: make-whole relief, economic and consequential damages, front and back pay damages, wage and benefit value losses, negative tax impact damages, punitive damages, reinstatement, all disciplinary removed from the employer's records, and an award of attorney fees and litigation costs.

II. JURISDICTION

6.     The jurisdiction of this Court is invoked pursuant to 42 U.S.C. 1981, et. seq. (the Civil Rights Act of 1964 and as amended in 1991) and under 42 U.S.C. 2000e, et seq. Jurisdiction is provided too under  28 U.S.C. 1331, Federal Question. Plaintiff also requests the Court to invoke Supplemental Jurisdiction to hear the pendent state statutory and common law actions that are raised herein. Venue for this action is proper in this Court because the action arose in Bucks County, which location is in this District

III. PARTIES

7.     Emily Rivera is the Plaintiff. Ms. Rivera resides in Bucks County, Pennsylvania.

8.     Elizabeth "Betty" Ann Knowles, Autumn Lucas and Carolyn Echalk are individuals; they are white non-Hispanic females, and each resides in the Philadelphia metropolitan area and within the Commonwealth of Pennsylvania.

9.     PennCare Medical Associates (hereafter described as Defendant PennCare), a/k/a PennCare Medical associates of Bucks County, a/k/a/ Penn Medicine, and part of or a/d/b/a University Of Pennsylvania Health Systems, is an incorporated entity that is engaged in commerce, which business activity is in the medical field and done within the Commonwealth of Pennsylvania, Bucks County

and surrounding counties of the Philadelphia Metropolitan area.

IV. MATERIAL FACTS

10. Plaintiff is Hispanic, a female, and for all the time related to this causes of action and events below identified was pregnant.

11. Each defendant for all times described in the complaint knew the Plaintiff was: Hispanic, a female and pregnant. Each knew because they saw such with their own eyes, were told such by Plaintiff or others, and/or read such in PennCare Medical's employment papers.

12. On or about February 2007 the Plaintiff was hired by and commenced employment with PennCare Medical Associates, a/k/a Penn Medicine, d/b/a University Of Pennsylvania Health Systems.

13. Plaintiff was hired by PennCare as a medical assistance / clinical care assistance, and Plaintiff worked at PennCare's 777 Township Line Road, Suite 200, Yardley (Lower Makefield Township) Bucks County, Pennsylvania location.

14. Plaintiff was qualified to perform the medical assistance \ clinical care assistance position when hired.

15. At all times while Plaintiff performed the duties of medical assistance and/or clinical care assistance the Plaintiff performed the duties satisfactorily under the work ethics and job description for PennCare Medical.

16. Plaintiff's immediate Supervsior was Elizabeth Ann Knowles; however, Plaintiff was also supervised by head nurse Carolyn Echalk and Doctor Dougherty.

17. Defendants Knowles, Lucas, and Echalk are not now nor were they in the entire years of 2010 and 2011 pregnant; each is and have always been since birth a white non-Hispanic female.

18. Plaintiff's performance reviews for employment duties as a medical assistance / clinical care

assistance were done by Supervsior Knowles and Dr. Dougherty.

19. All of the Plaintiff's written performance review categories, for all reviews for 2007, 2008 and 2009 were indicated as satisfactory.

20. Plaintiff until the March 10, 2011 termination had received no time off, suspension or unpaid suspension for poor work performance as a medical assistance / clinical care assistant.

21. On or about December 27, 2010 Plaintiff was pregnant and was rushed from home to the hospital due to bleeding from the pelvic region or otherwise described as a pregnancy complication. Plaintiff was treated and released for the pregnancy complication.

22. On or about December 28, 2010 the Plaintiff reported to work as scheduled.

23. Plaintiff on December 28, 2010 told supervising doctor Dougherty and to Plaintiff's immediate supervisor Knowles that the prior day she (the Plaintiff] had been treated for and diagnosed with a medical pregnancy complication which complication required rest of the pelvic region.

24. The Plaintiff requested supervisor Knowles to provide some minor work accommodation, such as to be allowed Plaintiff to work a bit slower and have someone help Plaintiff with the heavy work duties, because the pregnancy medical condition could cause Plaintiff to lose the unborn baby. Dr. Dougherty suggested Plaintiff should not have reported to work at all but stayed home to rest.

25. Knowles told the Plaintiff that she [Knowles] would check with Human Resources and see about allowing the accommodations.

26. On or about December 30, 2010, Supervsior Knowles told the Plaintiff, "You will have to try and suck it up because there is no one for me to pull to help you." Knowles further said, "If you feel you can't handle it now and have to get someone to help you and replace your spot then it's going to be permanent."

4

27. Following Supervsior Knowles' comment, Plaintiff reported Knowles' comment to supervising registered nurse Carolyn Echalk.

28. On or about January 6, 2011 Plaintiff was given a performance review by Dr. Dougherty and Knowles.

29. During the review, Plaintiff was told that" your work has been good up and until the week of December 28, 2010 to December 30, 2010."

30. During the review, Dougherty and Knowles also told Plaintiff that "your work between December 28, 2010 and December 30, 2010 has not been fast enough."

31. Since December 28, 2010 and lastly on or about March 7, 2011 supervisor Knowles, knowing that the Plaintiff was to "deliver" in August, pointed to the Plaintiff belly and said: "you are not allowed to go out early on maternity leave because Dr. Dougherty is going on vacation in July, so you better keep that sucker [baby] in."

32. On or about March 8, 2011 co-employee Autumn Lucas, who was working and on duty, came to the "Treatment Room" in the hospital, for personal a medical care, and Lucas began to speak with co-employee Nefatina (who too was working and on duty).

33. While Lucas spoke with Nefatina, while in the presence of the Plaintiff, Lucas started to talk about her (Lucas') medical information. Plaintiff at this time excused herself, saying, "I'm going to excuse myself because you are talking about your medical stuff I don't need to hear."

34. On or about March 9, 2011 supervisor Knowles asked Plaintiff to come to her office. In the office, Knowles said:

    (a) "What happened when you were in the treatment room with Nefatina?"

    (b) "You are being accused of going through Autumn's [medical] chart and in violation of HIPPA."

5

35. At the time, Knowles refused to tell Plaintiff who were the accusers and only told Plaintiff that she was being accused by two employees of searching through Autumn's chart and looking at Autumn's "med list and laughing." Knowles stated too that she would be contacting Plaintiff later to hear her (Plaintiff's) side of the story.

36. Plaintiff later learned that the accusers were Autumn and Carolyn Echalk. Knowles did say without naming names that Echalk said she (Echalk) saw Plaintiff looking over Nefatina's shoulder and at Autumn's chart.

37. On March 9, 2011, Supervsior Knowles placed the Plaintiff on "unpaid administrative leave."

38. On or about March 10, 2011 the Plaintiff was constructively terminated from employment. Plaintiff was told the basis for her termination was a failure to follow policy. The policy violation stated by Elizabeth Ann Knowles was: a disclosure of patient medical records and a poor work attendance history."

39. On March 14, 2011 Betty Ann Knowles terminated the Plaintiff by letter. According to the letter, the termination was "effective March 14, 2011." The termination basis as written in the termination letter was "inappropriate access of confidential information."

40. Plaintiff's termination came without Knowles ever speaking with the Plaintiff and hearing the Plaintiff's side of the accusation.

41. Plaintiff asked PennCare Medical to review the termination. The review was purportedly done and the investigation relied on the animus supervisors words; the animus supervisors were defendants Echalk and Knowles.

42. On or about March 23, 2011 Betty Anne Knowles, Practice Administrator, wrote to Plaintiff following the purported investigation that was presumably done by Ronald Barg the Executive Director of CCA. The letter from Knowles read: "After thorough review of the information provided

6

to me regarding the incident on March 8, 2011, the decision of termination still stands. The appropriate action has been taken."

43. Plaintiff on June 10, 2011 filed with the Equal Employment Opportunity Commission a charge of employment discrimination because of Race, Sex and Pregnancy. The Charge was duel filed with the Pennsylvania Human Relation Commission. The Charge named the employer (Penn MedicalCare Associates) and identified Defendants Echalk, Lucas and Knowles as the animus employees and aiders and abettors.

44. On or about July 28, 2011, Plaintiff was on the phone and with her mother at the Langhorne Pennsylvania Pep-Boys Auto Store. Also at the Pep-Boys store at the same time was Autumn Lucas. Plaintiff however arrived first.

45. Lucas followed Plaintiff into the Pep-Boys store and when inside the story followed the Plaintiff around the store. While each was at the register, Lucas opened her wallet and pointed the wallet towards the Plaintiff. Lucas then flashed the money in the wallet.

46. Plaintiff, at the time Lucas was flashing the money in the wallet, asked Lucas why she lied and if she [Lucas] felt good about causing Plaintiff to lose her employment.

47. Lucas laughed following the Plaintiff's question. Lucas then said "I have a lawyer and will report this [the event at Pep-Boys] to Ronald Barg [CEO of UPHS]."

48. Supervsior Knowles filled Plaintiff's former medical assistances position and Autumn Lucas replaced the Plaintiff's medical assistant position (opened by the termination).

49. The basis for Plaintiff's poor evaluation, suspension and termination is a pretextual reason, because:

    A - The Plaintiff did not access or disclose patient medical information or records.

    B – PennCare has a computer log-in system for medical records. Plaintiff was accused of

7

improperly accessing the computer medical records system; however, the log-in system confirmed Plaintiff had not access the medical record system or Lucas' medical record.

C – Other non-Hispanic females have been late to report to work and/or accessed patient medical records in violation of policy and have not been terminated.

D - Knowles replied that no special treatment would be given to Plaintiff and Plaintiff would just have to come in to work or lose her job and position after Plaintiff reported to the employer, Dougherty, and Knowles, that she was having pregnancy complication that might cause the baby to be lost and that the medical condition might cause her to work a bit slower and need some help or employment accommodation.

E. PennCare and Knowles knew and knew on March 10, 2011 that Autumn Lucas lies and made false allegations against others, including patients and other PennCare employees, and that Lucas' lies have even been investigated by the Lower Makefield Township (Bucks County) Police Department.

50. Other non-Hispanic and/or pregnant woman have engaged in substantial similar conduct as is alleged by the employer to have been done by the Plaintiff but these employees were not terminated or disciplined. For example, white female medical assistance Linda Senick (approximately 35 years of age) and white female register nurse Carolyn Echalk (approximately 60 years of age).

51. As a direct or the proximate result of the defendants' acts described above: viz the work mistreatment, to require the Plaintiff to work without accommodations, evaluate the work as "slow" thus poor, and falsely accuse the Plaintiff of a HIPPA violation, when it was known or should have been known by the Defendants to be factually untrue, but to nevertheless terminate the Plaintiff and thereafter harassment at the Pep-Boy Auto store, the Plaintiff sustained economic loss and personal injury.

52. Plaintiff economic loss from the Defendants' acts is in excess of $300,000.00.

53. Plaintiff personal injury resulted in psychological care, which injury remains to date and has not been determined to have ended or when it will end. Plaintiff sought treatment, however, due to the loss of income by the termination, not having health insurance or the economic ability to afford

8

health insurance or the care, the Plaintiff is unable to continue the psychological care.

54. The Defendants, Lucas', Knowles', Echalk's and PennCare Medicine, acts were extreme and outrageous.

55. Defendants Lucas, Knowles, Echalk and PennCare Medicine acted with intentional animus for the Plaintiff and Plaintiff's race, sex and/or pregnancy. As a direct and proximate result of such intent and conduct therefrom the Plaintiff was humiliated, embarrassed, and suffered extreme emotional distress and a loss of society, enjoyment of life, and employment.

56. The extreme emotional distress manifested into physical form, such as but not limited to: sleepless nights, crying, loss of hair, eye twitching, shakes, and nausea.

57. The Defendants at all times described in this complaint acted:

    (a) recklessly,

    (b) intentionally,

    (c) maliciously,

    (d) with ill will,

    (e) a hatred for the Plaintiff's race, sex and pregnancy conditions;

    (f) with discriminatory intent and intentional animus for the plaintiff's race, sex or pregnancy condition,

    (g) for the purpose to discriminate and cause the harm that was suffered by the Plaintiff,

    (h) with deliberate indifference or reckless disregard for the Plaintiff rights, race, sex and/or pregnancy condition,

    (i) outrageously and

    (j) beyond the bounds that society accepts.

58. Plaintiff has exhausted all available administrative remedies.

9

59. Plaintiff on March 23, 2012 was issued a right-to-sue letter by the EEOC and the right to sue

letter was issued at the decision of the Equal Employment Opportunity Commission. The Right-to-

Sue letter was issued on the Plaintiff's Sex Race and Pregnancy discrimination charge. The letter was

received by the Plaintiff on or about March 30, 2012.

60. The Defendants' names as captioned above are named in Plaintiff's employment

discrimination charge. Each Defendant was aware of and defended against the Plaintiff's

Employment Discrimination Charge, and the defense by the Defendants was through attorney Sean

V. Burke, Esq. Associate General Counsel, Penn Medicine, 133 South 36th St. Suite 300,

Philadelphia, PA. 19104.

V. CAUSES OF ACTION

**COUNT I**
**42 USC 2000e et seq. - Title VII**
**Employment Sex and Race Discrimination**
**<u>Mixed Motive and Pretextual Decision</u>**

61.   Plaintiff repeats all the preceding paragraphs here and as though each paragraph was

repeated verbatim.

62.   Plaintiff is a Hispanic female and a Hispanic.

63.   Plaintiff for the purpose of this Count and as a Hispanic female belongs to no less than

two classes that are protected under law; here, Plaintiff belongs to a Hispanic class and Plaintiff also

belongs to a female class, which classes are both protected class under the anti-discrimination in

employment laws of the United States and Commonwealth of Pennsylvania

64.   Penn MedicalCare Associates employs in excess of 15 employees, and Penn MedicalCare

Associates is an "employer" as the term "employer applies to Title VII (42 USC 2000e.

65.   Defendant PennCare is an entity that falls under 42 Title 2000e (Title VII), relating to equal

employment opportunity and prohibiting employment discrimination and retaliation.

66. PennCare since January 2009 and in the entire years 2010 and 2011 knew it could be held liable for employment discrimination under Title VII and/or the Pennsylvania Human Relations Act for the actions of its supervisors and employees.

67. Plaintiff's Hispanic race and/or female sex played a part, or was a motivating part, or a determinative factor, in the decision to evaluate the Plaintiff's work performance, to suspend, constructively discharge and/or terminate the Plaintiff from employment or the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship with Penn Medicine, d/b/a PennCare Medical Association [of Bucks County].

68. The Employer failed to conduct a prompt or appropriate investigation of the Plaintiff's complaint to supervisor Echalk, for example to conduct an independent investigation of the complaint or of the allegations by the animus supervisors Knowles and Echalk and employee Lucas.

69. The Employer's decisions concerning the Plaintiff were done through and by its employees, representative and/or agents that included employees (defendants) Echalk, Knowles and Lucas.

70. The decision to not reinstate the plaintiff or to revoke the suspension and terminations but to uphold the poor performance review, suspension and terminations, and the decision to give a poor evaluation and to impose a suspension and the termination of the Plaintiff, was made by the Employer upon reliance of the information obtained from animus supervisors Knowles and Echalk, and employee Autumn Lucas.

71. The decision of PennCare Medicine the Employer to uphold the suspension, poor evaluation and termination of the Plaintiff, for unauthorized accessing a computer file, was merely a cover-up for discrimination.

72. Plaintiff's race and/or sex played a part or a was motivating part and/or determinative factor

in the decision to evaluate the Plaintiff's work performance, to suspend, constructively discharge and/or terminate the Plaintiff from employment or the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship with Penn Medicine, d/b/a PennCare Medical Association [of Bucks County].

73. The decision to not reinstate or revoke discipline, and/or the decision to impose or uphold the poor evaluation, suspend, and terminate of the Plaintiff, was made upon a reliance of and the information obtained from animus supervisors Knowles and Echalk and employee Lucas.

74. The decision to impose and uphold the adverse employment action was merely a cover-up for discrimination.

75. Plaintiff was subjected to harassment by supervisor Knowles and this harassment was motivated by plaintiff's race and/or sex. In that, Knowles regularly and perversely belittled and made the Plaintiff the brunt of offensive joking by pointing to Plaintiff extended belly and say to the Plaintiff for all to hear that Plaintiff had to "keep that sucker in" (meaning to not give birth to Plaintiff's baby). That Plaintiff has to "suck it up". That Plaintiff would be permanently removed from her position if accommodations were given for the pregnancy. That Plaintiff could not leave early if maternity leave was needed early. Knowles repeatedly told plaintiff she was making it more than what it actually was.

76. Plaintiff's employer, defendant Penn Medical, d/b/a/ PennCare Medical Associate and/or a/k/a Hospital of the University of Pennsylvania, is liable for racial and sexual harassment because:

      a.  Plaintiff was subjected to hard work in order to not lose her employment when at the time of the hard work demand the Plaintiff was in medical need for rest to avoid not losing her unborn baby, which medical necessity was known to the employer and animus supervisors;

      b.  Plaintiff was also told to do another employee's work, and

12

    c.  Plaintiff repeatedly had her extended belly from the pregnancy pointed at and told at that time to not take time off and to keep that sucker in.

    d.  Plaintiff was then suspended by Knowles the suspension was without pay, the basis for the suspension was knowingly false; thus too the accusation of an employment policy violation, and then Plaintiff was terminated.

    e.  And the aforedescribed acts were done when Plaintiff was working, in the work place and by Plaintiff's supervisor.

    f.  The employer condoned, ratified and/or acquiesced to the supervisor's acts

77. Knowles' conduct was not welcomed by the plaintiff.

78. Knowles' conduct was motivated by the fact that plaintiff is Hispanic and/or female.

79. The conduct was so severe or pervasive that a reasonable person in plaintiff's position or member of plaintiff's race would find plaintiff's work environment to be hostile or abusive.

80. The conduct was so severe or pervasive that Plaintiff found the work environment to be hostile or abusive.

81. Plaintiff believed her work environment to be hostile or abusive, as a result of Knowles' conduct, and so much so that Plaintiff would cry, become depressed and sought psychological care.

82. Plaintiff suffered an adverse "tangible employment action" as a result of the hostile work environment; here, a significant change in employment status for the Plaintiff occurred; the Plaintiff was suspended without pay and then fired from the employment. The adverse action also caused significant change in benefits, pay and employment condition or duties, for all were lost.

  83. As a direct or the proximate result of the intentional employment sex and race discrimination and/or the harassment and/or hostile work environment, the Plaintiff suffered economic damages in excess of $100,000 and personal injury, such as emotional distress, loss of society and enjoyment of life.

84. As a direct or the proximate cause of the illegal employment discrimination the Plaintiff

13

suffered economic damages and a personal injury. Plaintiff lost wages, employment benefits and value of the benefits, loss of society and enjoyment of life; became depressed, experience extreme emotional, and was humiliated and embarrassed.

WHEREFORE, Plaintiff prays a trial by jury is held and that she be awarded all relief allowed under law and equity, and that she be awarded make-whole relief, front and back pay, reinstatement, clearance of all adverse employment information, compensatory damages, punitive damages, reasonable attorney fees and litigation costs.

## COUNT II
### Discrimination – Pregnancy
### 42 U.S.C. § 2000e-2(a) The Pregnancy Discrimination Act

85. Plaintiff repeats here all the preceding paragraphs and as though each paragraph was repeated verbatim.

86. Penn MedicalCare Associates employee in excess of 15 employees, and Penn MedicalCare Associates is an "employer" as the term "employer applies to Title VII (42 USC 2000e-2 (a).

87. Defendant Penn MedicalCare Associates is an employer covered under the Civil Rights Act of 1964, Pregnancy Discrimination Act (PDA) 42 USC 2000e-2(a), which Act protects a pregnant employee from discriminatory action that is based on a pregnancy status.

88. Plaintiff was pregnant and known to be pregnant by each defendant (Penn Medical Care, Knowles, Autumn and Echalk, at and during the times and events which are described above in paragraphs 21 through 44.

89. Plaintiff a covered employee under Civil Rights Act of 1964, Pregnancy Discrimination Act (PDA) (42 USC 2000e-2(a)) because Plaintiff was a women affected by pregnancy or related condition.

90. Plaintiff was not treated in the same manner as other employees with similar abilities or

14

limitations. In that Plaintiff was not afforded any accommodation, such as to be allowed to work slower, obtain help with heavy work-loads or take maternity leave when needed. Plaintiff instead was told by supervisor Knowles to keep the child in, not take time off, and if she did need accommodations such as help or time off then would be a permanent change (meaning Plaintiff would be let go or removed from her position permanently). Plaintiff too was belittled about being pregnant, ridiculed, and made a joke by supervisor Knowles. Plaintiff was also required to perform work when it was medically unsafe to do such work, and Plaintiff was falsely accused of policy violations and then suspended and terminated.

91. Plaintiff was not treated as described above in paragraph 76, before her pregnancy.

92. Plaintiff was subjected to unlawful employment discrimination because of her pregnancy, status of pregnancy and/or condition of the pregnancy. In that: (a) Plaintiff was pregnant, the employer knew it, because Plaintiff told the employer (Dr. Dougherty and Knowles, and supervisors Knowles, Echalk and Dougherty commented to Plaintiff of the pregnancy. (b) The plaintiff was qualified for her job, meaning she was performing her job well enough to meet her employer's legitimate expectations. Plaintiff was not told until after the pregnancy that her work was not acceptable to the employer. (c) Plaintiff suffered adverse employment decisions; here, a poor evaluation, suspension and termination. (d) There is a nexus between her pregnancy and the adverse employment action by time and inference between the adverse action and the time of it to the pregnancy.

93. As a direct or the proximate cause of the illegal employment discrimination the Plaintiff suffered economic damages and a personal injury. Plaintiff lost wages, employment benefits and value of the benefits, loss of society and enjoyment of life; became depressed, experience extreme emotional, and was humiliated and embarrassed.

WHEREFORE, Plaintiff prays a trial by jury is held and that she be awarded all relief allowed under law and equity, and that she be awarded make-whole relief, front and back pay, reinstatement, clearance of all adverse employment information, compensatory damages, punitive damages, reasonable attorney fees and litigation costs.

## COUNT III
## 42 USC 1981(b)
## Race Discrimination

94. Plaintiff repeats here all the preceding paragraphs and as though each paragraph was repeated verbatim.

95. Plaintiff is a Hispanic and belongs to a class protected; here, Plaintiff belongs to a Hispanic class which is a protected class under federal Law (42 USC §1981).

96. At all times for this cause of action Defendants Knowles, Echalk, and Lucas knew Plaintiff was Hispanic.

97. At all times for this cause of action Defendants Lucas, Knowles and Echalk acted intentionally to and with discriminatory intent against the plaintiff, because of the Plaintiff's Hispanic race.

98. Each aforenamed defendant: Knowles, Echalk, and Lucas, used Plaintiff's race as a motivating or determinative factor when each defendant formed an agreement and took substantial steps under the agreement to fabricate a lie about the Plaintiff with co-employee Nefatina Harris accessing Lucas' confidential medical information in the computer system and thus violated employment policy.

99. The purpose for the lie and agreement was to not only allow Knowles to terminate Plaintiff and replace Plaintiff with Lucas, and so Lucas could replace the Plaintiff and earn Plaintiff's wages, but to protest each for not taking action for Knowles conduct towards Plaintiff that had been reported

16

to Echalk but not investigated by PennCare Medicine.

100.     In furtherance of the aforementioned agreement; Knowles, Echalk and Lucas took substantial step to complete the purpose of the agreement. Knowles suspended the Plaintiff and Lucas and Echalk lied about the events to others to influence the others to uphold Knowles' decision to suspend and terminate Plaintiff.

101.     Echalk and Knowles lied to others to advance the discriminatory purpose, and they lied to Angela B. Wurster, Chief Operating Officer; Joseph Hearney, Chief Financial Officer, and Ronald Barg, Executive Director for CCA.

102.     Plaintiff's race played a part or was a motivating part and/or determinative factor in the decision to evaluate the Plaintiff's work performance, to suspend, constructively discharge and/or terminate the Plaintiff from employment or the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship with Penn Medicine, d/b/a PennCare Medical Association [of Bucks County].

103.     The decision to not reinstate, revoke discipline and/or to impose invoke or uphold a poor evaluation, suspend, and terminate the Plaintiff was made upon a reliance of the information obtained from animus supervisors Knowles and Echalk and employee Lucas , and their conduct was merely a cover-up for discrimination.

104.     Plaintiff was subjected to harassment by Knowles, and this harassment was motivated by plaintiff's race.

105.     Defendant Knowles, Echalk and Lucas are liable for racial discrimination and harassment because:

> a.  Knowles subjected the Plaintiff to different treatment hen other were subjected to, such as subjecting the Plaintiff to hard work  or to  lose her employment if she sought accommodation , not providing Plaintiff with accommodation for a medical need or

17

rest to avoid not losing her unborn baby, which medical necessity was known to Lucas;

b.  Plaintiff was also told to do another employee's work, and

c.  Knowles repeatedly to the Plaintiff while pointing to the Plaintiff's extended belly from the pregnancy that cannot take time off and to keep that sucker in.

d.  Plaintiff was then suspended by Knowles. The suspension was without pay, and the basis for the suspension was knowingly false, thus too the accusation by Lucas, ECHALK and Knowles of an employment policy violation.

e.  Plaintiff was terminated due to Knowles, Lucas and Echalk.

f.  After termination, Lucas followed Plaintiff and embarrassed and humiliated Plaintiff at the Pep-Boys store.

g.  Echalk failed to take action to stop Knowles and lied to others to protect Knowles.

106.    Knowles' Echalk's and Lucas' conduct was not welcomed by the plaintiff.

107.    Knowles' Echalk's and Lucas' conduct was motivated by the fact that plaintiff is Hispanic.

108.    The conduct by Knowles, Echalk and Lucas was so severe or pervasive that a reasonable person in plaintiff's position or member of plaintiff's race would find plaintiff's work environment to be hostile or abusive.

109.    Plaintiff believed her work environment to be hostile or abusive as a result of Knowles' conduct, and so much so that Plaintiff would cry, become depressed and sought psychological care.

110.    Plaintiff suffered an adverse "tangible employment action" as a result of the hostile work environment; here, a significant change in employment status, for the Plaintiff was suspended without pay and then fired, which adverse action caused significant change in benefits, pay and employment condition or duties.

111.     As a direct or the proximate cause of the illegal employment discrimination the
Plaintiff suffered economic damages in excess of $100,000 and a personal injury. Plaintiff lost
wages, employment benefits and value of the benefits, loss of society and enjoyment of life; became
depressed, experience extreme emotional, and was humiliated and embarrassed.

WHEREFORE, Plaintiff prays a trial by jury is held and that she be awarded all relief
allowed under law and equity, and that she be awarded make-whole relief, front and back pay,
reinstatement, clearance of all adverse employment information, compensatory damages, punitive
damages, reasonable attorney fees and litigation costs.

**COUNT IV**
**State Claim**
**Intentional Infliction of Emotional Distress**
**PA Human Relations Act – 43 Pa. C.S. 951 et seq.**
**Race, Sex and Pregnancy Discrimination Mixed Motive and Pretextual Decisions**
**<u>Aider and Abettor Liability</u>**

111.     Plaintiff repeats here all the preceding paragraphs and as though each paragraph was
repeated verbatim.

113.     Penn MedicalCare Associates is an "employer" as the term "employer applies to the
Pennsylvania Human Relations Act (43 P.C. S. § 951et seq.).

114.     Plaintiff is a Hispanic female and a Hispanic. Plaintiff as such belongs to a class
protected under law; here, Plaintiff belongs to a Hispanic class, a female class, and a class for being
pregnant or under a condition of pregnancy, which classes are protected class under the anti-
discrimination in employment laws of the Commonwealth of Pennsylvania; specifically, the
Pennsylvania Human Relations Act (43 P.C. S. § 951et seq.).

115.     Plaintiff's protected class membership or classes played a part or a was motivating part
or a determinative factor in the decision to evaluate the Plaintiff's work performance, to suspend,

19

constructively discharge and/or terminate the Plaintiff from employment or the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship with Penn Medicine, d/b/a PennCare Medical Association [of Bucks County].

116.     The Employer PennCare Medicine failed to conduct an investigation by Plaintiff to Echalk or an independent investigation of the allegations by animus supervisors Knowles and Echalk, and the Employer's decisions was done through and by its employees, representative and/or agents.

117.     The Employer's decision to not reinstate, revoke discipline and/or to uphold the poor performance review, suspension and terminations, and the decision to give a poor evaluation and to impose a suspension and the termination of the Plaintiff, was made by the Employer upon reliance of the information obtained from animus supervisors Knowles and Echalk, and employee autumn.

118.     The Employer's decision to accuse and later uphold the suspension, poor evaluation and termination of the Plaintiff for unauthorized accessing a computer file was merely a cover-up for discrimination.

119.     The Employer's decisions and cover-up are a part of the Employer's policy to engage in employment discrimination or condone it, cover it up, ratify it, or acquiesce to it when done by its employees and supervisors.

120.     Defendants Knowles, Echalk and Autumn Lucas aided and abetted the Employer's policy to engage in employment discrimination or condone it, cover it up, ratify it, or acquiesce to it when done by its employees and supervisors, or to not investigate complaint of a hostile work environment, harassment and/or race, sex or pregnancy discrimination.

121.     Plaintiff suffered adverse "tangible employment action" and as a result of such and the employer's policy, hostile work environment, harassment, and discrimination, for there was a

20

significant change in Plaintiff's employment status; specifically, the Plaintiff was suspended without pay and fired from the employment, which adverse action caused significant change in Plaintiff's benefits, pay and employment condition or duties, which all were lost.

122.       As a direct or the proximate result of the intentional employment sex and race discrimination and/or the harassment and/or hostile work environment, the Plaintiff suffered economic damages in excess of $100,000 and personal injury, such as emotional distress, loss of society and enjoyment of life.

123.       As a direct or the proximate cause of the illegal employment discrimination the Plaintiff suffered economic damages and a personal injury. Plaintiff lost wages, employment benefits and value of the benefits, loss of society and enjoyment of life; became depressed, experience extreme emotional, and was humiliated and embarrassed.

WHEREFORE, Plaintiff prays a trial by jury is held and that she be awarded all relief allowed under law and equity, and that she be awarded make-whole relief, front and back pay, reinstatement, clearance of all adverse employment information, compensatory damages, punitive damages, reasonable attorney fees and litigation costs.

Respectfully,

Brian M. Puricelli
Attorneys for Plaintiff

Law Offices of Brian Puricelli
691 Washington Crossing Road
Newtown PA 18940
(215) 504-8115

21